# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GEORGE WATSON, derivatively on behalf of ANADARKO PETROLEUM CORPORATION and OCCIDENTAL PETROLEUM CORPORATION, | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| R.A. WALKER, ROBERT G. GWIN, ROBERT P. DANIELS, ERNEST A. LEYENDECKER, ANTHONY R. CHASE, DAVID CONSTABLE, PAULETT EBERHART, PETER J. FLUOR, JOSEPH W. GORDER, JOHN R. GORDON, SEAN GOURLEY, MARK MCKINLEY, and ERIC D. MULLINS, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| ANADARKO PETROLEUM CORPORATION and OCCIDENTAL PETROLEUM CORPORATION, | |
| Nominal Defendants. | |

## VERIFIED SHAREHOLDER DOUBLE DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff George Watson ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendants Anadarko Petroleum Corporation ("Anadarko" or the "Company") and Occidental Petroleum Corporation ("Occidental"), files this Verified Shareholder Double Derivative Complaint against Individual Defendants R.A. Walker, Robert G. Gwin, Robert P. Daniels, Ernest A. Leyendecker, Anthony R. Chase, David Constable, Paulett Eberhart, Peter J. Fluor, Joseph W. Gorder, John R. Gordon, Sean Gourley, Mark McKinley, and Eric D. Mullins (collectively, the "Individual Defendants," and together with Anadarko, the "Defendants") for

breaches of their fiduciary duties as directors and/or officers of Anadarko, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Anadarko and Occidental, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder double derivative action that seeks to remedy wrongdoing committed by Anadarko's directors and officers from February 20, 2015 through May 2, 2017 (the "Relevant Period").

2.      The double derivative claims asserted in this Complaint are the claims that belong to Anadarko, which is the wholly-owned subsidiary of Occidental, and, thus, are the claims that ultimately belong to Occidental.

3.      Anadarko was founded in 1959 and was one of the world's largest independent energy exploration and production companies prior to its acquisition. Headquartered in The Woodland, Texas, Anadarko engages in the exploration, development, production, and marketing of oil and gas resources worldwide.

4.      Occidental is an international oil and gas exploration and production company that is headquartered in Houston, Texas and conducts operations through various subsidiaries in the United States, the Middle East, and Latin America. Following its acquisition of Anadarko, Occidental is one of the largest oil and gas companies situated in the United States.

5.      In early 2009, Anadarko discovered the "Shenandoah" deepwater oil field in the Gulf of Mexico through drilling the first exploration well, named "Shenandoah #1," to approximately 30,000 feet. Following its initial discovery, over the next eight years Anadarko spudded several subsequent appraisal wells in Shenandoah, seeking to assess the commercial viability of the field.

6.      The Company described the Shenandoah project as "one of the largest discoveries in the company's history[,]" making the project a vital source of interest for investors in the Company. In 2013, analysts predicted that the Company's reported results indicated that the reservoir "could be two or three times bigger- or more- than the company's estimate of more than 300 million barrels of oil[.]" Throughout the Relevant Period, the Company continued to make positive statements regarding the value and prospects of Shenandoah's resources. Anadarko reported billions of dollars in suspended exploratory well costs in connection with the Shenandoah project appraisal activities, which the Company justified based on management's projections of continued drilling or development activities. However, in reality, the appraisal process was not producing the types of results Defendants had primed the market to believe and expect.

7.      On May 2, 2017, the Company announced that it was suspending further appraisal activities as the latest Shenandoah well had not encountered oil-water contact in the eastern portion of the field. Due to the poor results of the Company's appraisal activities, Anadarko also announced "that the Shenandoah project no longer satisfies the accounting requirements for the

continued capitalization of the exploratory well costs[]" and expensed $435 million in suspended exploratory well costs related to the Shenandoah project.

8.      On this news, the Company's share price dropped $4.33 per share, or approximately 8%, the following day, closing at $51.95 per share on May 3, 2017.

9.      On May 9, 2019, years after the end of the Relevant Period, Anadarko entered into an Agreement and Plan of Merger (the "Merger Agreement") with Occidental and a wholly-owned subsidiary of Occidental, Baseball Merger Sub 1 Inc. (the "Merger Subsidiary"). Pursuant to the Merger Agreement, Occidental acquired all outstanding shares of Anadarko stock, which were exchanged for shares of Occidental stock and cash. Occidental's acquisition of Anadarko was completed on August 8, 2019, on which date Occidental acquired all of the outstanding shares of Anadarko, and Anadarko merged with the Merger Subsidiary, continuing as the surviving entity and the wholly-owned subsidiary of Occidental (collectively, the "Merger").

10.     In connection with the Merger, on August 8, 2019, all of the officers and directors of Anadarko ceased to be directors or officers of the Company.

11.     Anadarko's common stock ceased trading on the New York Stock Exchange ("NYSE") prior to the open of trading on August 9, 2019.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the resources, value, and economic prospects of the Shenandoah oil field were generally overstated; (2) published information concerning the purported success or potential of certain appraisal wells

were exaggerated; (3) negative reports and data about the appraisal wells were concealed from the public; and (4) Anadarko failed to maintain adequate internal controls over financial reporting. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Over 1.65 million shares of the Company's common stock were repurchased by the Company between March 2015 and April 2017 for approximately $113.5 million. As the Company stock was actually only worth $51.95 per share, the price at which it was trading on May 3, 2017, the Company overpaid over $27.6 million in total. Moreover, two of the Individual Defendants engaged in insider sales during the Relevant Period while the stock was artificially inflated, netting proceeds of over $3.5 million, collectively.

15.     In light of the Individual Defendants' misconduct, which has subjected Anadarko, its former Chairman, President, and Chief Executive Officer ("CEO"), its former Executive Vice President, Finance and Chief Financial Officer ("CFO"), and its former Executive Vice President of International and Deepwater Exploration to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Texas (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were

improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In part because of the substantial damage the Individual Defendants inflicted on Anadarko and because of the indemnification provision in the Merger Agreement immunizing all of the Individual Defendants from liability, a majority of the current Board of Directors of Occidental (the "Parent Board") caused Occidental to acquire Anadarko at an unfairly low price. A majority of the Parent Board caused Occidental to include an indemnification provision in the Merger Agreement immunizing all of the Individual Defendants from liability, which is patently unreasonable given the Individual Defendants' breaches of fiduciary duty and other misconduct. As such, a majority of the Parent Board cannot consider a demand to commence litigation against the Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

19.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff, Occidental, and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

Verified Shareholder Derivative Complaint

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     The Court has personal jurisdiction over each of the Defendants and Occidental because each Defendant and Occidental is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Delaware or who has minimum contacts with this District to justify the exercise of jurisdiction over them. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants and Occidental have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

22.     Venue is proper in this District because Anadarko and Occidental are incorporated in this District. In addition, the Defendants and Occidental have conducted business in this District, and Defendants' and Occidental's actions have had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Occidental common stock. Plaintiff continuously held Anadarko common stock since before the beginning of the Relevant Period through the closing of the Merger, at which time, by dint of the Merger, Plaintiff became a shareholder of Occidental, and since which time Plaintiff has continuously held Occidental common stock.

24.     Plaintiff is a citizen of Kansas.

### Nominal Defendant Anadarko

25.     Anadarko is a Delaware corporation with its principal executive offices at 1201 Lake Robbins Drive, The Woodlands, Texas 77380. Anadarko is a wholly-owned subsidiary of

Occidental. Prior to the Merger, Anadarko's shares traded on the NYSE under the ticker symbol "APC."

**Nominal Defendant Occidental**

26.     Occidental is a Delaware corporation with its principal executive offices located at 5 Greenway Plaza, Suite 110, Houston, Texas 77046. Occidental's shares trade on the NYSE under the ticker symbol "OXY."

**Defendant Walker**

27.     Defendant R.A. Walker ("Walker") served as the Company's CEO and director from May 2012, and as Chairman of Anadarko's Board of Directors (the "Board") from May 2013, until the Merger. He also served as President of Anadarko from February 2010 until November 2018. Defendant Walker served as the Chair of the Executive Committee during the Relevant Period. According to the Company's Schedule 14A filed with the SEC on March 17, 2017 (the "2017 Proxy Statement"), as of March 1, 2017, Defendant Walker beneficially owned about 938,381 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Walker owned about $62 million worth of Anadarko stock.

28.     For the fiscal year ended December 31, 2015, Defendant Walker received $17,084,382 in compensation from the Company. This included, *inter alia*, $1,350,000 in salary, $8,321,429 in stock awards, $2,794,960 in option awards, and $1,930,500 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2016, Defendant Walker received $18,650,252 in compensation from the Company. This included, *inter alia*, $1,300,000 in salary, $8,362,171 in stock awards, $2,828,445 in option awards, and $2,670,200 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2017, Defendant Walker received $16, 959,896 in compensation from the Company. This included, *inter alia*, $1,300,000 in salary,

$8,345,537 in stock awards, $2,776,583 in option awards, and $1,436,500 in non-equity incentive plan compensation.

29.     The Company's 2017 Proxy Statement stated the following about Defendant Walker:

> Mr. Walker, 60, was named Chairman of the Board of the Company in May 2013, in addition to the role of Chief Executive Officer and director, both of which he assumed in May 2012, and the role of President, which he assumed in February 2010. He previously served as Chief Operating Officer from March 2009 until his appointment as Chief Executive Officer. He served as Senior Vice President, Finance and Chief Financial Officer from September 2005 until March 2009. Mr. Walker is a director of the Houston Branch of the Dallas Federal Reserve, a Trustee for the Houston Museum of Natural Science, a member of the Business Council (Executive Committee), Business Roundtable, All-American Wildcatters (Chairman 2017 and 2018), and the Board of Directors of the American Petroleum Institute (Executive Committee). He also serves as the Chairman of the Risk Committee at BOK Financial Corporation (NASDAQ: BOKF). In addition to his current public-company directorship [at BOK Financial Corp.], in the past five years Mr. Walker also served on the boards of Temple-Inland, Inc. and CenterPoint Energy, Inc. (NYSE: CNP), as well as Western Gas Equity Holdings, LLC (NYSE: WGP) and Western Gas Holdings, LLC (NYSE: WES), both of which are subsidiaries of Anadarko.

30.     Defendant Walker is a citizen of Texas.

**Defendant Gwin**

31.     Defendant Robert G. Gwin ("Gwin") served as the Company's Executive Vice President, Finance and CFO from May 2013 until November 2018, when he was promoted to President of the Company, which he remained until the Merger. Prior to 2013, he served as the Senior Vice President, Finance and CFO from March 2009.  According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Gwin beneficially owned about 390,677 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gwin owned about $25.8 million worth of Anadarko stock.

32.     For the fiscal year ended December 31, 2015, Defendant Gwin received 6,287,070 in compensation from the Company.  This included, *inter alia*, $778,846 in salary, $3,336,853 in stock awards, $1,120,768 in option awards, and $813,894 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2016, Defendant Gwin received 7,484,039 in compensation from the Company.  This included, *inter alia*, $750,000 in salary, $3,352,460 in stock awards, $1,133,936 in option awards, and $1,125,750 in non-equity incentive plan compensation. For the fiscal year ended December 31, 2017, Defendant Gwin received 6,806,368 in compensation from the Company.  This included, *inter alia*, $750,000 in salary, $3,345,768 in stock awards, $1,113,146 in option awards, and $605,600 in non-equity incentive plan compensation.

33.     The Company's Form 10-K filed with the SEC on February 17, 2017 stated the following about Defendant Gwin:

> Mr. Gwin was named Executive Vice President, Finance and Chief Financial Officer in May 2013 and previously served as Senior Vice President, Finance and Chief Financial Officer since March 2009 and Senior Vice President since March 2008. He also has served as Chairman of the Board of WGH since October 2009 and as a director since August 2007. Additionally, Mr. Gwin has served as Chairman of the Board of WGEH since September 2012 and served as President of WGH from August 2007 to September 2009 and as Chief Executive Officer of WGH from August 2007 to January 2010. He joined Anadarko in January 2006 as Vice President, Finance and Treasurer and served in that capacity until March 2008. He has served as Chairman of the Board of LyondellBasell Industries N.V. since August 2013 and as a director since May 2011.

34.     Defendant Gwin is a citizen of Texas.

**Defendant Daniels**

35.     Defendant Robert P. Daniels ("Daniels") served as Anadarko's Executive Vice President of International and Deepwater Exploration from May 2013 until his retirement in

December 2016. Prior to that, he held a variety of positions since joining the Company in 1985, including key positions in Anadarko's exploration group.

36.     For the fiscal year ended December 31, 2015, Defendant Daniels received 6,472,003 in compensation from the Company.  This included, *inter alia*, $726,923 in salary, $3,411,830 in stock awards, $1,145,949 in option awards, and $759,635 in non-equity incentive plan compensation.

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Daniels made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 20, 2015 | 38,449 | $80.94 | $3,112,062 |

Thus, in total, before the fraud was exposed, he sold 38,449 Company shares on inside information, for which he received approximately $3.1 million. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

38.     Upon information and belief, Defendant Daniels is a citizen of Texas.

**Defendant Leyendecker**

39.     Defendant Ernest A. Leyendecker ("Leyendecker") served as the Company's Executive Vice President of International Deepwater Exploration from 2016 until his retirement in 2018. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Leyendecker beneficially owned about 115,442 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Leyendecker owned about $7.6 million worth of Anadarko stock.

40.     For the fiscal year ended December 31, 2016, Defendant Leyendecker received 4,401,376 in compensation from the Company.  This included, *inter alia*, $473,654 in salary, $1,883,405 in stock awards, $637,048 in option awards, and $637,550 in non-equity incentive plan compensation.

41.     The Company's Form 10-K filed with the SEC on February 17, 2017 stated the following about Defendant Leyendecker:

> Mr. Leyendecker was named Executive Vice President, International and Deepwater Exploration in August 2016. Prior to this position, he served as Senior Vice President, International Exploration since April 2015 and Senior Vice President, Gulf of Mexico Exploration since February 2014. Prior to that, he served as Vice President, Gulf of Mexico Exploration since May 2011 and as Vice President of Corporate Planning and Gulf of Mexico Exploration since October 2010. Mr. Leyendecker joined Anadarko upon the acquisition of Kerr-McGee Corporation in August 2006. He has held positions of increasing responsibility with Anadarko and Kerr-McGee Corporation, including Exploration Manager for the Gulf of Mexico and General Manager for Worldwide Exploration, Engineering and Planning. Mr. Leyendecker began his career with Marathon Oil Company prior to pursuing a leadership role with Enterprise Oil Gulf of Mexico, which was acquired by Shell Oil in 2002.

42.     Upon information and belief, Defendant Leyendecker is a citizen of Texas.

**Defendant Chase**

43.     Defendant Anthony R. Chase ("Chase") served as a Company director from February 2014 until the Merger. Defendant Chase also served as a member of the Governance and Risk Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Chase beneficially owned about 16,385 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Chase owned about $1.1 million worth of Anadarko stock.

44.     For the fiscal year ended December 31, 2016, Defendant Chase received $361,845 in compensation from the Company. This included $360,045 in stock awards and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Chase received

$371,478 in compensation from the Company. This included $119,600 in fees earned, $250,021 in stock awards and $1,857 in all other compensation.

45.     The Company's 2017 Proxy Statement stated the following about Defendant Chase:

Mr. Chase, 62, is Chairman, Chief Executive Officer and owner of ChaseSource, L.P., a Houston-based staffing and real estate development firm. He served as an Executive Vice President of Crest Investment Company, a Houston-based private equity firm, from January 2009 until December 2009. Prior to these positions, he served as the Chairman and Chief Executive Officer of ChaseCom, L.P., a global customer relationship management and staffing services company that he founded and owned until its sale in 2007 to AT&T. Mr. Chase's entrepreneurial track record also includes two other successful business ventures, including Chase Radio Partners, which he founded, developed and ultimately sold, and Cricket Wireless, which he co-founded, developed and later sold. Mr. Chase has also been a Professor of Law at the University of Houston since 1991 and has published numerous environmental law and other law review articles during his tenure. Mr. Chase is on the board of directors of the Greater Houston Partnership, and served as its Chairman during 2012. From July 2004 to July 2008, he served as a director of the Federal Reserve Bank of Dallas, and also served as its Deputy Chairman from 2006 until his departure in July 2008. He is also on the board of directors of the Houston Endowment and the Texas Medical Center and serves on the Board of Trustees for St. John's School and KIPP Schools. Mr. Chase holds Bachelor of Arts, Master of Business Administration and Juris Doctor degrees from Harvard University. In addition to Mr. Chase's current public-company directorship [at Paragon Offshore plc], in the past five years he also served on the boards of Sarepta Therapeutics, Inc. (NASDAQ: SRPT) and Western Gas Holdings, LLC (NYSE: WES), a subsidiary of Anadarko.

46.     Upon information and belief, Defendant Chase is a citizen of Texas.

**Defendant Constable**

47.     Defendant David E. Constable ("Constable") served as a Company director from July 2016 until the Merger. Defendant Constable also served on the Audit Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Constable beneficially owned about 4,610 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Constable owned about $304,352 worth of Anadarko stock.

48.     For the fiscal year ended December 31, 2016, Defendant Constable received $261,819 in compensation from the Company. This included $47,850 in fees earned, $213,076 in stock awards, and $893 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Constable received $363,928 in compensation from the Company. This included $112,050 in fees earned, $250,021 in stock awards, and $1,857 in all other compensation.

49.     The Company's 2017 Proxy Statement stated the following about Defendant Constable:

> Mr. Constable, 55, has served as an advisor to Sasol Limited (JSE: SOL) (NYSE: SSL) (Sasol), an international integrated energy and chemicals company based in South Africa, since July 2016. Prior to that he served as Sasol's President and Chief Executive Officer from July 2014 through June 2016 and previously served as Chief Executive Officer from July 2011 through July 2014. Prior to Sasol, Mr. Constable spent nearly 30 years at Fluor Corporation (NYSE: FLR) (Fluor) where he lived on several continents and served in various leadership positions, primarily in the oil and gas, refining, chemical, power and mining industries. Prior to moving to Sasol, Mr. Constable served as Group President of Operations for Fluor. He is a member of The Business Council and a past member of the World Economic Forum International Business Council. He is also an advisor at Cerberus Capital Management, one of the world's leading private investment firms. Mr. Constable holds a bachelor's of science degree in civil engineering from the University of Alberta, and graduated from the International Management Program at the Thunderbird School of Global Management, as well as the Advanced Management Program at the Wharton School at the University of Pennsylvania. In addition to Mr. Constable's current public-company directorships [at ABB Ltd, Rio Tinto Limited, and Rio Tinto plc], in the past five years he also served on the board of Sasol.

50.     Upon information and belief, Defendant Constable is a citizen of Florida.

**Defendant Eberhart**

51.     Defendant Paulett Eberhart ("Eberhart") served as a Company director from August 2004, and as Lead Director from February 2016 until the Merger. Defendant Eberhart also served as Chair of the Governance and Risk Committee and member of the Executive Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Eberhart beneficially owned about 40,614 shares of the Company's common stock. Given that the price per

share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Eberhart owned about $2.7 million worth of Anadarko stock.

52.     For the fiscal year ended December 31, 2016, Defendant Eberhart received $418,043 in compensation from the Company. This included $416,243 in stock awards, and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Eberhart received $421,974 in compensation from the Company. This included $420,117 in stock awards, and $1,857 in all other compensation.

53.     The Company's 2017 Proxy Statement stated the following about Defendant Eberhart:

> Ms. Eberhart, 63, currently serves as Chairman and Chief Executive Officer of HMS Ventures, a privately held business involved with technology services and the acquisition and management of real estate. From January 2011 through March 2014, she served as the President and Chief Executive Officer of CDI Corp. (NYSE: CDI) (CDI), a provider of engineering and information technology outsourcing and professional staffing services. She served as a consultant to CDI from April 2014 through December 2014. Ms. Eberhart also served as Chairman and Chief Executive Officer of HMS Ventures from January 2009 until January 2011. She served as President and Chief Executive Officer of Invensys Process Systems, Inc. (Invensys), a process automation company, from January 2007 to January 2009. From 1978 to 2004, she was an employee of Electronic Data Systems Corporation (EDS), an information technology and business process outsourcing company, and held roles of increasing responsibility over time, including senior level financial and operating roles. From 2003 until March 2004, Ms. Eberhart was President of Americas of EDS, and from 2002 to 2003 she served as President of Solutions Consulting at EDS. Ms. Eberhart is a Certified Public Accountant. In addition to Ms. Eberhart's current public-company directorships [at Ciber, Inc., LPL Financial Holdings Inc., and Valero Energy Corporation], in the past five years she also served on the boards of Cameron International Corporation, CDI and Advanced Micro Devices, Inc. (NASDAQ: AMD).

54.     Defendant Eberhart is a citizen of Texas.

**<u>Defendant Fluor</u>**

55.     Defendant Peter J. Fluor ("Fluor") served as a Company director from August 2007 until the Merger. Defendant Fluor is also a member of the Compensation and Benefits Committee.

According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Fluor beneficially owned about 138,057 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Fluor owned about $9.1 million worth of Anadarko stock.

56.     For the fiscal year ended December 31, 2016, Defendant Fluor received $370,714 in compensation from the Company. This included $368,914 in stock awards and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Fluor received $361,938 in compensation from the Company. This included $360,081 in stock awards and $1,857 in all other compensation.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Fluor:

Mr. Fluor, 69, has been Chairman and Chief Executive Officer of Texas Crude Energy, LLC, a private, independent oil and gas exploration company located in Houston, Texas, since 1990. He has been employed by Texas Crude Energy, LLC since 1972 and took over the responsibilities of President in 1980. Mr. Fluor serves as lead director of Fluor Corporation (NYSE: FLR). In addition to Mr. Fluor's current public-company directorship [at Fluor Corporation], in the past five years he also served on the board of Cameron International Corporation.

58.     Upon information and belief, Defendant Fluor is a citizen of Oklahoma.

**Defendant Gorder**

59.     Defendant Joseph W. Gorder ("Gorder") has served as a Company director from July 2014 until the Merger. Defendant Gorder also served as the Chair of the Compensation and Benefits Committee and as a member of the Executive Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Gorder beneficially owned about 13,519 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gorder owned about $892,524 worth of Anadarko stock.

Verified Shareholder Derivative Complaint

60.     For the fiscal year ended December 31, 2016, Defendant Gorder received $377,900 in compensation from the Company. This included $376,100 in stock awards and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gorder received $386,956 in compensation from the Company. This included $385,089 in stock awards and $1,857 in all other compensation.

61.     The Company's 2017 Proxy Statement stated the following about Defendant Gorder:

> Mr. Gorder, 59, is Chairman, President and Chief Executive Officer of Valero Energy Corporation (NYSE: VLO) (Valero), an international manufacturer and marketer of transportation fuels, other petrochemical products and power. He served as President and Chief Operating Officer of Valero from November 2012, until he assumed the role of Chief Executive Officer on May 1, 2014. He assumed the role of Chairman of the Board effective December 31, 2014. Mr. Gorder previously served as Executive Vice President and Chief Commercial Officer beginning in January 2011, and formerly led Valero's European operations from its London office. He previously served as Executive Vice President – Marketing and Supply beginning in December 2005. Prior to that, he held several positions with Valero and Ultramar Diamond Shamrock Corporation with responsibilities for corporate development and marketing. Mr. Gorder is also Chairman and Chief Executive Officer of Valero Energy Partners LP (NYSE: VLP), a midstream logistics master limited partnership formed by Valero in 2013.

62.     Defendant Gorder is a citizen of Texas.

**Defendant Gordon**

63.     Defendant John R. Gordon ("Gordon") served as a Company director from April 1988 until the Merger. Defendant Gordon also served as a member of the Compensation and Benefits Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Gordon beneficially owned about 180,679 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gordon owned about $11.9 million worth of Anadarko stock.

64.     For the fiscal year ended December 31, 2016, Defendant Gordon received $365,599 in compensation from the Company. This included $113,763 in fees earned, $250,036 in stock awards, and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gordon received $361,878 in compensation from the Company. This included $110,000 in fees earned, $250,021 in stock awards, and $1,857 in all other compensation.

65.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gordon made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| November 11, 2016 | 7,500 | $61.30 | $459,750 |

Thus, in total, before the fraud was exposed, he sold 7,500 Company shares on inside information, for which he received approximately $459,750. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

66.     The Company's 2017 Proxy Statement stated the following about Defendant Gordon:

> Mr. Gordon, 68, is Senior Managing Director of Deltec Asset Management LLC, a registered investment firm located in New York, New York. He was President of Deltec Securities Corporation from 1988 until it was converted into Deltec Asset Management LLC. Prior to joining Deltec Asset Management LLC, Mr. Gordon was a managing director of Kidder, Peabody & Co., where he spent 12 years in the firm's corporate finance department.

67.     Upon information and belief, Defendant Gordon is a citizen of New York.

**Defendant Gourley**

68.     Defendant Sean Gourley ("Gourley") served as a Company director from September 2015 until the Merger. Defendant Gourley also served as a member of the Governance

and Risk Committee. According to the Company's 2016 Proxy Statement, as of March 1, 2017 Defendant Gourley beneficially owned about 8,693 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Gourley owned about $573,912 worth of Anadarko stock.

69.     For the fiscal year ended December 31, 2016, Defendant Gourley received $361,836 in compensation from the Company. This included $110,000 in fees earned, $250,036 in stock awards, and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gourley received $361,878 in compensation from the Company. This included $110,000 in fees earned, $250,021 in stock awards, and $1,857 in all other compensation.

70.     The Company's 2017 Proxy Statement stated the following about Defendant Gourley:

> Dr. Gourley, 37, has served as Chief Executive Officer of Primer Technologies, Inc., a company building software to power artificial intelligence applications for the finance and military intelligence industries, since he founded it in February 2015. From March 2009 to January 2015, he was the Chief Technology Officer of Quid, Inc., a San Francisco-based augmented intelligence company he founded which builds software for strategic decision-making. Dr. Gourley studied at The University of Oxford as a Rhodes Scholar where he received a Ph.D. in physics, and he received both his Bachelor of Science and Master of Science in physics from the University of Canterbury in Christchurch, New Zealand. He was additionally a Post-Doctoral Research Fellow at the Said Business School at Oxford University and is currently an Equity Partner with Data Collective Venture Capital Fund, investing in key data and algorithmic technologies.

71.     Defendant Gourley is a citizen of California.

**Defendant McKinley**

72.     Defendant Mark C. McKinley ("McKinley") served as a Company director from February 2015 until the Merger. Defendant McKinley also served as a member of the Audit Committee. According to the Company's 2016 Proxy Statement, as of March 1, 2017 Defendant McKinley beneficially owned about 10,700 shares of the Company's common stock. Given that

the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Defendant McKinley owned about $706,414 worth of Anadarko stock.

73.     For the fiscal year ended December 31, 2016, Defendant McKinley received $361,836 in compensation from the Company. This included $110,000 in fees earned, $250,036 in stock awards, and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant McKinley received $361,958 in compensation from the Company. This included $55,000 in fees earned, $305,101 in stock awards, and $1,857 in all other compensation.

74.     The Company's 2017 Proxy Statement stated the following about Defendant McKinley:

> Mr. McKinley, 60, has served as Managing Partner of MK Resources LLC, a private oil and gas development company specializing in the recovery and production of crude oil and the development of unconventional resource projects, for more than ten years. He is also the founder and President of Labrador Oil Company, a private oil and natural gas exploration and development firm. In addition, Mr. McKinley is the Managing Partner of M Natural Resource Partners, LP, which holds mineral, royalty and real estate interests, both directly and indirectly through various partnerships. Mr. McKinley currently serves on the Boards of Directors of the Merrymac McKinley Foundation and the Tip of the Spear Foundation.

75.     Upon information and belief, Defendant McKinley is a citizen of Pennsylvania.

**Defendant Mullins**

76.     Defendant Eric D. Mullins ("Mullins") served as a Company director from May 2012 until the Merger. Defendant Mullins is also Chair of the Audit Committee and a member of the Executive Committee. According to the Company's 2017 Proxy Statement, as of March 1, 2017, Defendant Mullins beneficially owned about 20,871 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 1, 2017 was $66.02, Mullins owned nearly $1.4 million worth of Anadarko stock.

77.     For the fiscal year ended December 31, 2016, Defendant Mullins received $386,823 in compensation from the Company. This included $385,023 in stock awards, and $1,800 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Mullins received $386,946 in compensation from the Company. This included $385,089 in stock awards, and $1,857 in all other compensation.

78.     The Company's 2017 Proxy Statement stated the following about Defendant Mullins:

> Mr. Mullins, 54, serves as the Managing Director and Co-Chief Executive Officer of Lime Rock Resources, a company that he co-founded in 2005 which acquires, operates and improves lower-risk oil and natural gas properties. From May 2011 through October 2015, he also served as the Co-Chief Executive Officer and Chairman of the Board of Directors of LRE GP, LLC, the general partner of LRR Energy, L.P., an oil and natural-gas company. Prior to co-founding Lime Rock Resources, Mr. Mullins served as a Managing Director in the Investment Banking Division of Goldman Sachs (NYSE: GS) where he led numerous financing, structuring and strategic advisory transactions in the division's Natural Resources Group. In addition to his current public-company directorships [at Pacific Gas and Electric Company and PG&E Corporation], in the past five years he served on the board of LRE GP, LLC.

79.     Upon information and belief, Defendant Mullins is a citizen of Texas.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

80.     By reason of their positions as officers, directors, and/or fiduciaries of Anadarko and because of their ability to control the business and corporate affairs of Anadarko, the Individual Defendants owed Anadarko and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage Anadarko in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Anadarko and its shareholders so as to benefit all shareholders equally.

81.    Each director and officer of the Company owed to Anadarko and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Anadarko, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

83.    To discharge their duties, the officers and directors of Anadarko were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Anadarko, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Anadarko's Board at all relevant times.

85.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate

and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Additionally, the Individual Defendants had a duty not to cause the Company to waste corporate assets by making the Company repurchase its own stock at artificially inflated prices, to the detriment of the Company and its shareholders.

86.     To discharge their duties, the officers and directors of Anadarko were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Anadarko were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Anadarko's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Anadarko conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Anadarko and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Anadarko's operations would comply with all applicable laws and Anadarko's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87.     Each of the Individual Defendants further owed to Anadarko and the shareholders the duty of loyalty requiring that each favor Anadarko's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

88.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Anadarko and were at all times acting within the course and scope of such agency.

89.     Because of their advisory, executive, managerial, and directorial positions with Anadarko, each of the Individual Defendants had access to adverse, non-public information about the Company.

90.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Anadarko.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

92.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

93.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred

under the authority of the Board, each of the Individual Defendants, who are directors of Anadarko, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

94.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

95.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Anadarko and was at all times acting within the course and scope of such agency.

### ANADARKO'S CODES OF ETHICS

96.     The Company's Code of Business Conduct and Ethics prior to the Merger (the "Code of Ethics") established that the Company's employees and directors were expected to "act in a manner consistent with the code" and comply with the law.

97.     The Company's Code of Ethics required employees to, among other things: "provide information that is accurate, complete, objective, timely, relevant and understandable in all material respects about Anadarko's financial condition and the results of operations." Moreover, the Code of Ethics provided that "Anadarko has a system of internal controls that is designed to ensure that all public disclosures, including filings with the [SEC] are transparent and in strict compliance with both the spirit and the letter of the laws governing public disclosures[]" recognizing that such disclosures "assist shareholders in understanding the challenges and risks that we face, [and] the business opportunities that are key to our long-term success[.]"

Verified Shareholder Derivative Complaint

98.     The Company also had an established "Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer" (the "Supplemental Code" and together with the Code of Ethics, the "Codes of Ethics"). The Supplemental Code required the CEO and CFO to, among other things, "[a]ct in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts[]" and to "review the annual and quarterly reports before certifying and filing them with the [SEC][]" to ensure information is accurate, complete, objective, relevant, timely and understandable.

99.     In violation of the Codes of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's internal controls and of the Company's compliance with its own policies and applicable laws, and disguised the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Codes of Ethics, the Individual Defendants who were members of the Board consciously disregarded their duties of loyalty, ethics, to act in the best interests of the Company, to use their free access to management to obtain all information necessary to fulfill their duties, and to assess their own performance as well as the CEO's and CFO's.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

100.    Incorporated as a subsidiary of Panhandle Eastern Corporation Pipe Line Company in 1959, Anadarko spun off into an independent entity in 1986.

101.    Anadarko explores for and develops oil and natural gas resources, operating onshore in the Americas, Africa and New Zealand as well as offshore. The Company had approximately 1.72 billion barrels-equivalent of proved reserves as of December 31, 2016, and sales revenues of $8.4 billion in 2016.

102.    During the Relevant Period, the Company was divided into three main operating divisions: Upstream, Midstream, and Marketing. Upstream was focused on exploration and capture of oil and gas resources. Midstream conducted transportation, storage, and wholesale marketing of oil and gas resources. Marketing was focused on bringing energy commodities to market.

103.    In early 2009, Anadarko, as operator, discovered the Shenandoah oil field in the deepwater Gulf of Mexico after drilling an exploratory well dubbed Shenandoah #1 (or Shenandoah-1) to a depth of approximately 30,000ft. Shenandoah-1 reportedly encountered 300ft of net oil pay.

104.    After its initial discovery, Anadarko initiated a series of appraisal wells over the next eight years in order to determine the value and commercial viability of the Shenandoah oil field. The Company spudded five appraisal wells between 2012 and 2017: Shenandoah-2, drilled in the middle of 2012; Shenandoah-3, drilled at the end of 2014; Shenandoah-4, drilled in the end of 2015; Shenandoah-5, drilled in the middle of 2016; and Shenandoah-6, drilled in the middle of 2017. Throughout its appraisal process on the Shenandoah project, Anadarko touted its high expectations for the field, describing it as "one of the largest discoveries in the company's history." During this time, the Company outlined that under the accounting method it utilized—the "successful efforts method of accounting," the Company initially capitalized or suspended exploratory costs related to a well discovering hydrocarbons, "pending a determination as to whether a commercially sufficient quantity of proved reserves can be attributed to the area as a result of drilling . . . If management determines that future appraisal drilling or development activities are unlikely to occur, associated suspended exploratory well costs are expensed."

Between 2014 and 2016, the Company reported billions of dollars in suspended exploratory well costs.

105.    News outlets quickly picked up on the exciting appraisal activities. On March 19, 2013, Oil & Gas Journal reported on Shenandoah-2, quoting Defendant Daniels, who stated that "Anadarko is strategically positioned in the Shenandoah basin, which has the potential to become one of the most prolific new areas in the deepwater Gulf of Mexico."[1] In October 2015, Offshore Energy Today reported that Shenandoah-4 "encountered more than 620 net feet of oil pay, moving the giant oil discovery a step closer toward development."[2] In 2016, Hart Energy, reporting on the Shenandoah project, stated that "the prospect looks attractive and Anadarko appears to have confidence in its potential, considering the company recently upped its working interest in Shenandoah to 33%."[3]

106.    Throughout the Relevant Period, and as detailed below, the Individual Defendants continued to make and/or cause the Company to make positive representations concerning the success and potential of the appraisal activities underway at Shenandoah.

107.    However, unbeknownst to the investing public, the prospects and activities concerning Shenandoah were a far cry from what the Individual Defendants primed the market to expect and believe. Even when it became clear to them that their projections were well off the mark and that the Shenandoah project was experiencing significant challenges, the Individual Defendants caused the Company to overstate the value and forecasts of Shenandoah by, *inter alia*,

---

[1]    https://www.ogj.com/exploration-development/discoveries/article/17257517/shenandoah-appraisal-cuts-more-than-1000-net-ft-of-oil-pay. Last visited March 4, 2020.

[2]    https://www.offshoreenergytoday.com/anadarko-finds-more-oil-at-shenandoah/.Last visited March 4, 2020.

[3]    https://www.hartenergy.com/news/anadarko-gears-shenandoah-6-appraisal-well-110552. Last visited March 4, 2020.

inflating projections, exaggerating findings of certain appraisal wells, and concealing negative reports and material information from the public, including that the assets of Shenandoah were "less than half the size . . .originally claimed in March 2014."[4] Ultimately, the Company would be forced to write the project off entirely at a loss of hundreds of millions of dollars.

108.    On May 9, 2019, Anadarko entered into the Merger Agreement with Occidental and the Merger Subsidiary. Pursuant to the Merger Agreement, Occidental acquired all outstanding shares of Anadarko stock, and exchanged each acquired share of Anadarko stock for 0.2934 of a share of Occidental stock and $59.00 in cash.[5]

109.    The Merger was completed on August 8, 2019, on which date Occidental acquired all of the outstanding shares of Anadarko common stock, and Anadarko became a wholly-owned subsidiary of Occidental. That same day, in connection with the Merger, each member of Anadarko's Board resigned. By August 9, 2019, Anadarko's stock ceased trading on the NYSE.

110.    The extent of the Individual Defendants' fraud remained concealed from the public until November 4, 2019, when an opinion published in the United States Court of Appeals for the Fifth Circuit revealed claims brought under seal by a former employee of Anadarko named Lea S. Frye ("Frye"), in an action captioned *Frye v. Anadarko Petroleum Corp*., No 18-20543 (5th Cir.) (the "WB Action").

**False and Misleading Statements**

***February 20, 2015 Form 10-K***

111.    On February 20, 2015, the Company filed with the SEC its annual report for the fiscal year ending December 31, 2014 on a Form 10-K (the "2014 10-K"), which was signed by

---

[4]      *See* November 4, 2019 WB Action opinion at p.2.
[5]      Pursuant to the Merger Agreement, Anadarko shareholders were entitled to receive cash in lieu of any fractional shares of Occidental stock.

Defendants Walker, Gwin, Chase, Eberhart, Fluor, Gorder, Gordon, McKinley, and Mullins, and non-parties Cathy Douglas, Richard L. George, Kevin P. Chilton ("Chilton"), and Charles W. Goodyear.

112.    Regarding the Shenandoah project, the 2014 10-K stated in relevant part:

> The Company spud the Shenandoah-3 well, its second appraisal well at the Shenandoah discovery, in the second quarter of 2014. The well finished drilling at the end of 2014 and found approximately 50% (1,470 feet) more of the same reservoir sands 1,500 feet down-dip and 2.3 miles east of the Shenandoah-2 well, which encountered over 1,000 feet of net oil pay in excellent quality Lower Tertiary-aged sands. The Shenandoah-3 well confirmed the sand depositional environment, lateral sand continuity, excellent reservoir qualities, and down-dip thickening.

113.    In addition, the 2014 10-K reported $1.522 billion in suspended exploratory well costs as of December 31, 2014.

114.    The 2014 10-K further maintained that the Company's internal controls over financial reporting were effective, stating in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting. Anadarko's internal control system was designed to provide reasonable assurance to the Company's Management and Directors regarding the preparation and fair presentation of published financial statements.
>
> * * *
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014 . . . Based on our assessment, we believe that as of December 31, 2014, the Company's internal control over financial reporting was effective based on those criteria.

115.    Attached to the 2014 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Securities Exchange Act of 1934, Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the SOX, signed by Defendants Walker and Gwin, attesting to the accuracy of the 2014 10-K.

***March 3, 2015 Capital Program and Guidance Call***

116.    On March 3, 2015, during a capital program and guidance call, Defendant Daniels continued to tout the progress of the Shenandoah project, maintaining that Shenandoah-3 was a "very successful appraisal well" and Anadarko was "excited about the advancement of Shenandoah."

### October 28, 2015 Earnings Call

117.    On October 28, 2015, Anadarko hosted an earnings conference call to discuss its third-quarter operating results for the fiscal quarter ending September 30, 2015. During the call, Defendant Gwin highlighted the Company's purported progress on Shenandoah-4, the quality of Shenandoah's resources, and the encouraging results uncovered at the reservoir, asserting that the results indicated that "we're right where we thought" with projected expectations of Shenandoah's assets. Defendant Gwin further stated in relevant part:

> The team did a really good job on [Shenandoah-4], and we're real pleased with it. We got 622 feet of pay.
>
> What we ended up doing was we tested up to the north with trying to find out where the basin edge was, and the first well established where the basin edge was. Then we came in and drilled to the south with a side track, and got the 622 feet of pay. It was all oil, we encountered no water in that.
>
> The reservoir quality in the initial assessment looks pretty—well it looks comparable to everything else we've found out there. So very good reservoir quality. We're still in the early stages of that evaluation.
>
> We're in the process of getting a core, so we just kicked off and we're going to do a bypass core just right next to this well. And that's to establish the reservoir quality in the oil column, which will roll directly into our development planning. So it's very important to get that core, and we're just in the process of it. That's going to give us a much better handle on all the fluid properties, all the reservoir properties. But we pushed the most known oil down about 400 feet.
>
> As I've mentioned, we didn't establish an oil water contact here, so that tells us there's more down below us. And we're looking at what the forward plan is after this bypass core, as to what else we're going to need to turn over to the planning team for the development planning. But we're very encouraged with what we saw, and it was well within the range of expectation of what we had put out there.

***February 2, 2016 Earnings Call***

118.    On February 2, 2016, Anadarko hosted a year-end earnings conference call to discuss its fourth quarter and year-end financial and operating results for the fiscal year ending December 31, 2015. During the call, Defendant Daniels boasted that the Company was "very pleased" with Shenandoah-4, which contained "over 620 feet of high-quality oil pay." Defendant Daniels further assured that Anadarko had "high expectations" for the Shenandoah-5 appraisal well.

***February 17, 2016 Form 10-K***

119.    On February 17, 2016, the Company filed with the SEC its annual report for the fiscal year ending December 31, 2015 on a Form 10-K (the "2015 10-K"), which was signed by Defendants Walker, Gwin, Chase, Eberhart, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins, and non-parties Chilton, Christopher O. Champion ("Champion").

120.    The 2015 10-K described that the Company had spud Shenandoah-4 during the second quarter of the year and that "[t]he subsequent Shenandoah-4 sidetrack encountered more than 620 net feet oil pay, extending the lowest known oil column down-dip. Following the success of the Shenandoah-4 sidetrack, the Company and its partners successfully acquired more than 550 feet of whole-core from the hydrocarbon-bearing reservoir interval."

121.    The 2015 10-K also reported $1.124 billion in suspended exploratory well costs as of December 31, 2015. This amount included offshore projects in the Gulf of Mexico (amounting to $314 million in costs) that had been capitalized greater than one year, the majority of which were "related to the Shenandoah discovery." The 2015 10-K maintained that "[w]ell costs have been suspended pending further appraisal activities, including drilling and analysis of well results." In line with Anadarko's purported accounting approach, the 2015 10-K assured that "[i]f additional

Verified Shareholder Derivative Complaint

information becomes available that raises substantial doubt as to the economic or operational viability of any of the projects, the associated costs will be expensed at that time."

122.    The 2015 10-K further maintained that the Company's internal controls over financial reporting were effective, stating, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting. Anadarko's internal control system was designed to provide reasonable assurance to the Company's Management and Directors regarding the preparation and fair presentation of published financial statements.
>
> * * *
>
> Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015 . . . Based on our assessment, we believe that as of December 31, 2015, the Company's internal control over financial reporting was effective based on those criteria.

123.    Attached to the 2015 10-K were SOX certifications signed by Defendants Walker and Gwin, attesting to the accuracy of the 2015 10-K.

### May 3, 2016 Earnings Call

124.    On May 3, 2016, Anadarko hosted an earnings conference call to discuss its first quarter financial and operating results for the quarter ending March 31, 2016. During the call, the Individual Defendants continued to positively represent the Shenandoah appraisal activities, even when prompted by analysts to disclose why the appraisal was "taking so long" and why so many appraisal wells were necessary. In response to these inquiries, Defendant Daniels assured that the scale and imaging complexities of the Shenandoah project were the culprits behind the delay, "not necessarily that we're seeing lots of bad surprises."

### July 27, 2016 Earnings Call

125.    These positive representations persisted. On July 27, 2016, Anadarko hosted an earnings call to discuss its second quarter financial and operating results for the quarter ending

Verified Shareholder Derivative Complaint

June 30, 2016. During the call, Defendant Walker stated that the Company was "real pleased with what we saw in the [Shenandoah] 5 well."

### February 17, 2017 Form 10-K

126.    On February 17, 2017, the Company filed with the SEC its annual report for the fiscal year ending December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Defendants Walker, Gwin, Chase, Eberhart, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins, and non-parties Champion, Chilton, and Claire S. Farley.

127.    The 2016 10-K described that the Company had spud Shenandoah-5 during the first quarter of the year and that "[t]he well encountered more than 1,040 net feet of oil pay, extending the resource in the central-to-eastern limits of the field." The 2016 10-K also stated that Anadarko spud the Shenandoah-6 appraisal well during the last quarter of the year and that the Company's "drilling objective is to establish the oil-water contact on the eastern flank of the field and to help quantify the resource potential of the basin." The 2016 10-K also established that the Company had increased its working interest in Shenandoah during the year from 30% to 33% "by participating in a preferential-right-process."

128.    The 2016 10-K reported $1.7 billion in suspended exploratory well costs as of December 31, 2016. This amount included "approximately $800 million related to our Shenandoah project in the Gulf of Mexico." The extent of suspended exploratory well costs signaled that Shenandoah had "sufficient reserves to justify completion as a producing well and sufficient progress is being made in assessing the reserves and the economics and operating viability of the project."

129.    The 2016 10-K further maintained that the Company's internal controls over financial reporting were effective, stating in relevant part:

Management is responsible for establishing and maintaining adequate internal control over financial reporting. Anadarko's internal control system was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

\* \* \*

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016 . . . Based on our assessment, we believe that the Company's internal control over financial reporting was effective as of December 31, 2016.

130.    Attached to the 2016 10-K were SOX certifications signed by Defendants Walker and Gwin, attesting to the accuracy of the 2016 10-K.

131.    The statements referenced in ¶¶ 111-130 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose and/or caused Anadarko to fail to disclose, *inter alia*, that: (1) the resources, value, and economic prospects of the Shenandoah oil field were generally overstated; (2) published information concerning the purported success or potential of certain appraisal wells were exaggerated; (3) negative reports and data about the appraisal wells were concealed from the public; and (4) Anadarko failed to maintain adequate internal controls over financial reporting. As a result of the foregoing, the Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

132.    On May 2, 2017, the truth about the success and resources of the Shenandoah field began to emerge when the Company filed its quarterly report with the SEC for the quarter ending March 31, 2017 (the "1Q17 10-Q").

133.    The 1Q17 10-Q reported that the Company recognized an impairment charge of $467 million related to the Shenandoah project and had expensed $435 million suspended

Verified Shareholder Derivative Complaint

exploratory well costs during the quarter, including $267 million previously capitalized for a period greater than one year.

134.    The 1Q17 10-Q further revealed that Shenandoah-6 and its subsequent sidetrack "did not encounter the oil-water contact in the eastern portion of the field[]" and that given the poor results of the appraisal well, "and the present commodity-price environment, the Company has currently suspended further appraisal activities. Accordingly, the Company determined that the Shenandoah project no longer satisfies the accounting requirements for the continued capitalization of the exploratory well costs."

135.    On this news, the Company's share price dropped $4.33 per share, or approximately 8%, from closing at $56.28 per share on May 2, 2017, to close at $51.95 per share the following day, on May 3, 2017.

136.    Although the 1Q17 10-Q revealed that the Shenandoah project had been overstated, the extent of the Individual Defendants' misconduct remained concealed from the investing public until November 4, 2019 when the United States Court of Appeals for the Fifth Circuit published an opinion in the WB Action (the "Opinion"), the pleadings and filings of which were under seal, that recounted allegations made by Frye, a whistleblower at the Company who was retaliated against, in the sealed complaint in July 2017.[6]

137.    Frye worked as an engineer for Anadarko from 2005 (well before the Relevant Period) until 2016, and was responsible for "evaluating the size of oil fields and developing economic models related to the viability of drilling and production project[.]" Frye was a Senior Reservoir Engineer and served as team lead for the Shenandoah project. As outlined by the

---

[6]    The pleadings and filings contained in the WB Action remain under seal. Facts and quotations outlined in this section are drawn from and set forth in detail in the Opinion, attached hereto as Exhibit 1.

Opinion, Frye maintained that Anadarko "knowingly published inflated information about its 2013 exploration successes during an investor conference[]" and "concealed bad reports about [Shenandoah-3] from the public." The misrepresentations were not limited to one appraisal well or time period, however. Rather, executives at the Company, including the Individual Defendants as outlined above, repeatedly and purposefully exaggerated exploration results or concealed bad reports and data from the public. The Opinion further outlined in relevant part:

> In a February 2015 call with investors, an Anadarko executive allegedly "described Shen 3 in glowing terms, claiming there was over 1,500 feet of 'quality sand,'" even though "well data revealed that Shen 3 was actually a dry hole." Finally, in an October 2015 earnings call, Anadarko allegedly exaggerated findings from the Shenandoah 4 appraisal, repeating past optimistic projections without revealing new data indicating that the potential of the well "was vastly overstated." Frye alleges that, although Anadarko "knew the Shenandoah resource was less than half the size Defendant had originally claimed in March 2014," it "made no corrections to its original projections."

138.   According to the Opinion, Frye's discomfort and efforts to condemn the misrepresentations being fed to the investing public were met with orders to use false maps of Shenandoah to support the Company's illusive success at Shenandoah:

> Between 2014 and 2015, Frye contends that she made clear she was uncomfortable with Anadarko's "false, misleading statements about Shenandoah and the misleading way faults were being mapped" to "justify resource projections that it knew were flimsy and unscientific." In a February 2014 meeting with Anadarko executives, Frye alleges that she presented an economic analysis stating "that the Shenandoah project value was likely much smaller than Defendant's exploration team had previously claimed." An Anadarko vice president, Ernie Leyendecker, allegedly responded angrily to Frye's conclusions and berated her economic analysis. Frye further alleges that, in August 2014 emails, Leyendecker was "adamant" that she and others conceal maps revealing the existence of faulting and instead use false maps of Shenandoah.

139.   Frye was thereafter excluded from important update meetings, denied access to the Company's partners and data needed to perform her duties, and prevented from participating in a benefits plan. According to the Opinion "[i]n January 2016, Frye told her supervisor that she would

not be a party to overstating the Shenandoah prospects." However, she "saw no indication that anything was being done to stop the fraud from continuing." According to Frye, by the spring of 2016, she could not take the environment at the Company any longer, and began suffering from depression and anxiety, prompting her to take leave under the Family and Medical Leave Act ("FMLA").

140.    Thereafter, Frye sent a letter to the SEC detailing the violations of the federal securities laws at the Company. The SEC letter remains under seal, as the Company maintains it is covered by a Proprietary Information and Invention Agreement ("PIIA") that was signed by Frye in connection with her employment in 2005.[7]

141.    The Opinion considered Frye's appeal from the United States District Court for the Southern District of Texas, and reversed the district court's dismissal of Frye's request for a declaratory judgment concerning her disclosure of the SEC letter, because the threat of litigation made by the Company against her was "of sufficient immediacy and reality to warrant the issuance of a declaratory judgement[.]"

### Repurchases During the Relevant Period

142.    During the period in which the Company made false and misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company.[8]

---

[7]    Frye resigned on May 19, 2016, and the Company retroactively shortened her FMLA leave, cancelled her and her family's health insurance, delayed her COBRA health coverage, and withheld payment for accrued unused vacation time. After Frye obtained counsel, she received her health benefits and vacation payments.

[8]    The amounts of stock repurchased and referenced in this subsection include shares related to stock received by the Company for payment of withholding taxes due on employee share issuances under share-based compensation plans.

Verified Shareholder Derivative Complaint

143.     According to the Company's quarterly report filed on Form 10-Q with the SEC on May 4, 2015, during the month of March 2015, the Individual Defendants caused the Company to repurchase 439,722 shares of its own common stock at an average price per share of approximately $82.03, for a total cost to the Company of $36 million.

144.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $30.08 more than the actual worth of each share during the month ended March 31, 2015. Thus, the total over payment by the Company for its repurchases of its own stock during March 2015 was approximately $13.2 million.

145.     According to the Company's quarterly report filed on Form 10-Q with the SEC on July 28, 2015, during the three month period ended June 30, 2015, the Individual Defendants caused the Company to repurchase 10,143 shares of its own common stock at an average price per share of approximately $85.95, for a total cost to the Company of $871,790.

146.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $34 more than the actual worth of each share during the three month period ended June 30, 2015. Thus, the total over payment by the Company for its repurchases of its own stock during the three month period ended June 30, 2015 was approximately $344,862.

147.     According to the Company's quarterly report filed on Form 10-Q with the SEC on October 27, 2015, during the three month period ended September 30, 2015, the Individual Defendants caused the Company to repurchase 6,033 shares of its own common stock at an average price per share of approximately $71.03, for a total cost to the Company of $428,523.

148.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $19.08 more than the actual worth of each share during the three month period ended September 30, 2015. Thus, the total over payment by the Company for its repurchases of its own stock during the three month period ended September 30, 2015 was approximately $115,109.

149.     According to the 2015 10-K, during the three month period ended December 31, 2015, the Individual Defendants caused the Company to repurchase 252,110 shares of its own common stock at an average price per share of approximately $69.90, for a total cost to the Company of approximately $17.6 million.

150.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $17.95 more than the actual worth of each share during the three month period ended December 31, 2015. Thus, the total over payment by the Company for its repurchases of its own stock during the three month period ended December 31, 2015 was approximately $4.5 million.

151.     According to the quarterly report filed on Form 10-Q with the SEC on October 31, 2016, during the three month period ended September 30, 2016 the Individual Defendants caused the Company to repurchase 28,932 shares of its own common stock at an average price per share of approximately $54.41, for a total cost to the Company of approximately $1.6 million.

152.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $2.46 more than the actual worth of each share during the three month period

ended September 30, 2016. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended September 30, 2016 was approximately $71,172.

153.    According to the 2016 10-K, during the three month period ended December 31, 2016 the Individual Defendants caused the Company to repurchase 88,923 shares of its own common stock at an average price per share of approximately $61.46, for a total cost to the Company of approximately $5.5 million.

154.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $9.51 more than the actual worth of each share during the three month period ended December 31, 2016. Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended December 31, 2016 was approximately $845,657.

155.    According to the Company's quarterly report filed on Form 10-Q with the SEC on May 2, 2017, during the three month period ended March 31, 2017, the Individual Defendants caused the Company to repurchase 331,383 shares of its own common stock at an average price per share of approximately $63.13, for a total cost to the Company of $20.9 million.

156.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $11.18 more than the actual worth of each share during the three month period ended March 31, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the three month period ended March 31, 2017 was approximately $3.7 million.

157.    According to the Company's Form 10-Q filed with the SEC on July 24, 2017, during April 2017, the Individual Defendants caused the Company to repurchase 239,044 shares

of its own common stock at an average price per share of approximately $62.19, for a total cost to the Company of approximately $14.8 million.

158.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.54 more than the actual worth of each share during the month of April 2017. Thus, the total over payment by the Company for its repurchases of its own stock during April 2017 was approximately 2.4 million.

159.    In total, the Company overpaid an aggregate amount of over $27.6 million for repurchases of its own stock during the period the Company made false and misleading statements and omissions.

## DAMAGES TO ANADARKO

160.    As a direct and proximate result of the Individual Defendants' conduct, Anadarko will lose and expend many millions of dollars.

161.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, former CFO, and former Executive Vice President of International and Deepwater Exploration and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

162.    Such losses include, but are not limited to, over $27.6 million that the Company overpaid, at the direction of the Individual Defendants, for its repurchases of its own stock at artificially inflated prices.

163.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties

to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

164.   Moreover, Anadarko's purchase price in the Merger was unfairly low because of the substantial damage the Individual Defendants had inflicted on Anadarko and because of the indemnification provision in the Merger Agreement immunizing all of the Individual Defendants from liability.

165.   As a direct and proximate result of the Individual Defendants' conduct, Anadarko has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

166.   Plaintiff brings this action derivatively and for the benefit of Anadarko to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Anadarko, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

167.   Anadarko and Occidental are named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

168.   Plaintiff is an Occidental shareholder, and she has been an Occidental shareholder continuously since the Merger. Prior to the Merger, Plaintiff was continuously a shareholder of Anadarko since before the beginning of the Relevant Period. Plaintiff will adequately and fairly represent the interests of Occidental and Anadarko in enforcing and prosecuting its rights, and, to

that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

169.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

170.     A pre-suit demand on the Parent Board is futile and, therefore, excused. At the time of filing of this action, the Parent Board consists of the following fifteen individuals: non-parties Vicki A. Hollub, Spencer Abraham, Eugene L. Batchelder, Margaret M. Foran, Carlos M. Gutierrez, William R. Klesse, Jack B. Moore, Avedick B. Poladian, Robert M. Shearer, and Elisse B. Walter (collectively, the "Directors") and non-parties Andrew F. Gould, Stephen I. Chazen, Margarita Paláu-Hernández, Nicholas Graziano and Andrew N. Langham. Plaintiff needs only to allege demand futility as to eight of the fifteen directors who are on the Parent Board at the time this action was commenced.

171.     Demand is excused as to all of the Directors because each one of them, acting collectively, caused Occidental to acquire Anadarko at an unfairly low price because of the substantial damage the Individual Defendants had inflicted on Anadarko and because of the indemnification provision in the Merger Agreement immunizing all of the Individual Defendants from liability, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against the Individual Defendants and the other perpetrators of the scheme described herein.

172.     Demand is further excused as to all of the Directors because each of the Directors approved an indemnification provision in the Merger Agreement immunizing all of the Individual Defendants from liability in connection with the scheme described herein. Pursuant to Section 6.3

of the Merger Agreement, the Individual Defendants, along with all other current and former officers, directors, and employees of the Company will be indemnified and held harmless against all losses or claims arising out of such individuals' positions with Anadarko. Section 6.3 of the Merger Agreement provides, in relevant part, the following:

> Parent shall cause the Surviving Corporation and each of its Subsidiaries, other than the MLP and its Subsidiaries, to indemnify, defend and hold harmless each Person who is now, or has been at any time prior to the date of this Agreement or who becomes prior to the Effective Time, a director, officer or employee of the Company or of such Subsidiary, as applicable, or who acts as a fiduciary under any Company Benefit Plan or is or was serving at the request of the Company or of such Subsidiary as a director, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other enterprise (the "Indemnified Persons") against all losses, claims, damages, costs, fines, penalties, expenses (including attorneys' and other professionals' fees and expenses), liabilities or judgments or amounts that are paid in settlement, of or incurred in connection with any threatened or actual claim (including a claim of a violation of applicable law), action, audit, demand, suit, proceeding, investigation or other proceeding at law or in equity or order or ruling, in each case whether civil, criminal, administrative, investigative or otherwise and whether or not such claim, action, audit, demand, suit, proceeding, investigation or other proceeding or order or ruling results in a formal civil or criminal litigation or regulatory action ("Proceeding") to which such Indemnified Person is a party or is otherwise involved (including as a witness) based, in whole or in part, on or arising, in whole or in part, out of the fact that such Person is or was a director, officer or employee of the Company or of such Subsidiary[.]

173.     Accordingly, under the Merger Agreement, the Individual Defendants cannot be held liable for any of their intentional or reckless misconduct alleged herein.  In other words, the Individual Defendants will receive home-free tickets.

174.     Given the Individual Defendants' complete absolution of any wrongdoing in the face of so much wrongdoing as alleged herein, Section 6.3 of the Merger Agreement is clear evidence that the Merger Agreement was entered into in bad faith and to deprive the Company of its claims against the Individual Defendants.

175.    Moreover, the Directors structured Occidental's acquisition of Anadarko so as to deprive Occidental shareholders of the right to vote on the acquisition. This decision prompted an activist Occidental shareholder to wage a drawn-out proxy contest with the Directors, alleging, among other things, that the Directors enacted the Merger as a defensive tactic out of the fear that Occidental itself would be acquired by another corporation, thereby causing the Directors to lose their positions of control over Occidental. These facts indicate that the Directors were self-interested in the Anadarko acquisition, and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action against the Individual Defendants, who controlled Anadarko, and who were in bad faith immunized from any wrongdoing by the Directors pursuant to the Merger Agreement.

176.    Additional reasons that demand on the Parent Board is futile follow.

177.    The Directors have longstanding business and personal relationships with certain of the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Director William R. Klesse served at Valero Energy Corporation ("Valero") in a number of positions between 2005 and May 2014, including as CEO and Chairman from 2007 through May 2014. Defendant Gorder succeeded William R. Klesse as CEO of Valero in May 2014, and prior to that, served in a number of other senior positions at Valero between 2005 and 2014, including as President and Chief Operating Officer from 2012 through 2014. Defendant Eberhart also currently holds a position at Valero, serving as a director since 2016. Thus, demand upon the Directors would be futile.

178.    Anadarko has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to

Verified Shareholder Derivative Complaint

recover for Anadarko any part of the damages Anadarko suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

179.    The acts complained of herein constitute violations of fiduciary duties owed by Anadarko's officers and directors, and these acts are incapable of ratification.

180.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least eight of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Parent Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Anadarko. Not only is Anadarko now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Anadarko by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over one hundred million dollars of its own shares on the open market at artificially-inflated prices, damaging Anadarko by millions of dollars.

183.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify

the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

184.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Anadarko not misleading.

185.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Anadarko. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

186.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executives and/or directors of the Company, as members of the Board, each of the Individual Defendants then serving as directors signed the Company's false and misleading Form 10-K's filed with the SEC during

the Relevant Period, including Defendants Walker, Gwin, Chase, Eberhart, Fluor, Gorder, Gordon, McKinley, and Mullins, who signed the 2014 10-K, Defendants Walker, Gwin, Chase, Eberhart, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins, who signed the 2015 10-K, and Defendants Walker, Gwin, Chase, Constable, Eberhart, Fluor, Gorder, Gordon, Gourley, McKinley, and Mullins, who signed the 2016 10-K.

187.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

188.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    The Individual Defendants, by virtue of their positions with Anadarko and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Anadarko within the meaning of Section 20 (a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause the Defendants to engage in the illegal conduct and practices complained of herein.

## THIRD CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

191.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Anadarko's business and affairs.

193.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

194.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Anadarko.

195.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

196.    Also in breach of their fiduciary duties owed to Anadarko, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the resources, value, and economic prospects of the Shenandoah oil field were generally overstated; (2) published information concerning the purported success or potential of certain appraisal wells were exaggerated; (3) negative reports and data about the appraisal wells were concealed from the public; and (4) Anadarko failed to maintain adequate internal controls over financial reporting.

197.    The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

198.    In further breach of their fiduciary duties owed to Anadarko, the Individual Defendants willfully or recklessly caused the Company to repurchase approximately $113 million worth of Company stock at artificially inflated prices.

199.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Anadarko's securities.

200.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Anadarko's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

201.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

202.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Anadarko has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

203.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

204.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Anadarko.

206.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Anadarko that was tied to the performance or artificially inflated valuation of Anadarko, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received proceeds from insider sales.

207.    Plaintiff, as a shareholder and a representative of Anadarko, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, proceeds from insider sales, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

208.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

209.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Anadarko, for which they are legally responsible.

211.    As a direct and proximate result of the Individual Defendants' abuse of control, Anadarko has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Anadarko

has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

212.    Plaintiff on behalf of Anadarko has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Anadarko in a manner consistent with the operations of a publicly-held corporation.

215.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Anadarko has sustained and will continue to sustain significant damages.

216.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

217.    Plaintiff, on behalf of Anadarko, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal

investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

220.     The Company wasted millions of dollars in repurchasing approximately $113 million worth of Company stock at artificially inflated prices

221.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

222.     Plaintiff on behalf of Anadarko has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Anadarko and Occidental, and that Plaintiff is an adequate representative of Anadarko and Occidental;

(b)     Declaring that the Individual Defendants have violated the federal securities laws and breached and/or aided and abetted the breach of their fiduciary duties to Anadarko;

(c)     Determining and awarding to Anadarko the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing the Defendants to take all necessary actions to reform and improve corporate governance and internal procedures to comply with applicable laws and to avoid repeating the damaging events described herein, including, but not limited to, the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the supervision of operations; and

2. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Anadarko restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: May 18, 2020                                    Respectfully submitted,

Of Counsel:                                            **PHILLIPS, MCLAUGHLIN & HALL, P.A.**

**THE ROSEN LAW FIRM, P.A.**                           */s/ John C. Phillips, Jr.*
Phillip Kim                                            John C. Phillips, Jr. (Bar No. 110)
275 Madison Avenue                                     Megan C. Haney (Bar No. 5016)
40th Floor                                             1200 N. Broom Street
New York, NY 10016                                     Wilmington, DE 19806
Telephone: (212) 686-1060                              Telephone: (302) 655-4200
Facsimile: (212) 202-3827                              Facsimile: (302) 655-4210
Email: pkim@rosenlegal.com                             Email: jcp@pmhdelaw.com
                                                       Email: mch@pmhdelaw.com

                                                       *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint